### FRANK ELLINGTON v. THE STATE.

#### No. 3059. Decided June 14, 1905.

**1.—Aggravated Assault—Evidence—Declaration of Third Party.**

While it is a correct rule of evidence that where the State proved a part of a conversation, defendant was entitled to prove the balance of such conversation, yet where the bill of exceptions failed to set out the materiality of a conversation between prosecutor and a third party had in defendant's presence, and also when he arrived on the scene of the difficulty, and on account of which he interfered on behalf of such third party, the court will not review the ruling of the lower court in excluding such testimony in the absence of a showing as to what such conversation was about.

**2.—Same—Evidence—Confession—Impeaching Testimony.**

Where in a prosecution for assault to murder, the State had introduced testimony that defendant had stated within thirty or forty minutes after the shooting, that he had fired the first shot at prosecutor, it was proper to exclude testimony of defendant's witnesses to show that defendant had, within fifteen or twenty minutes after the shooting, told one of them and the other next day that the prosecutor fired the first shot at defendant and that then he fired at prosecutor, as the State introduced such testimony as a confession and not as impeaching testimony.

**3.—Same—Verdict—Use of Words.**

A verdict which uses the preposition "to" instead of the words, "at a fine" is good on motion for new trial.

Appeal from the District Court of Bell. Tried below before Hon. Jno. M. Furman.

Appeal from a conviction of aggravated assault; penalty, a fine of $300.

The following statement taken from appellant's brief is substantially correct:

The testimony discloses that one Frank Bauman and the appellant each fired a shot at the other on the afternoon of Oct. 28, 1901; that the difficulty occurred on Nolan Creek about three miles west of Belton, appellant's farm lying on the north side of Nolan Creek, and Frank Bauman residing with his mother about a mile below and on the opposite side of the creek to apellant's place.

Frank Bauman testified in substance that on the afternoon of the difficulty he had gone up the creek hunting, that he was walking up the creek on the north side of the same near the adjoining fence between appellant's land and the land of one George Adams. "I saw Ellington just before I went into his pasture riding horseback between the creek and Adams' house. I went on up the creek about one hundred and seventy-five yards in appellant's pasture and sat there in a swing until I got tired and returned and crossed over on the south side of the creek. At this time I saw Ellington on the north side of the creek between sixty-five and seventy yards, on horseback, standing there cursing and abusing Mrs. Adams. I spoke to him and told him, "You know Mr. Adams is not at home, that is the reason you are taking it out on her." He then cursed me and said, "I am coming down there and take it out on you." He told me to come across the creek to him and I started, got down on the gravel bar, and he drew his six shooter and said, "I am going to kill you." I had left my gun by a post on the bank and I ran up the hill and grabbed my gun, and as I ran behind a tree as I got in about two feet of the tree he shot at me, but did not hit me. He had run down the creek on Adams' land. I shot at him as soon as he shot at me. He fired first. After I ran behind the tree he told me to come out from behind it and he would let me alone. He said he was going home and get his gun and load it with buckshot and fill me so full of holes I would not hold air. I do not care whether the defendant is convicted or not, but I am paying money to employ counsel to prosecute him. I did not say of Ellington to Bob Smith and to Charlie Smith before this trouble that I wanted to get a shot at him. I did not hear my mother say that she was not coming to my trial because I was to blame and this Adams woman had gotten me in this trouble.

Mrs. Drew Adams testified that she lived with her husband, Geo. Adams about two hundred yards north of the creek and just below and adjoining Ellington's place. That she had gone down to the creek

and met defendant "and he began cursing me for dogging his cattle. He cursed Frank Bauman, while we were standing there. Frank Bauman passed near us going up the creek. Ellington spoke to him and said he had a great mind to shoot him, now, Frank did not say anything. Ellington and I stood there and talked a little while, we were talking loud. I next saw Frank across the creek on the south side. Ellington was cursing me and used bad words, he said we had four big dogs and Bauman spoke to Ellington about taking it out on me because Mr. Adams was not at home, and Ellington cursed him and when Bauman got down to the creek, Ellington drew his pistol and I told Frank Bauman to run. He was not below the spring and I thought he was taking rest on a post. I broke and run and did not see the shooting. A few minutes after I got home and after the shooting, Ellington came up to the house and said he wanted me to remember who shot first. He said that he tried to kill Bauman, that he would kill him yet. . My husband at that time was in town. My state of feelings are bad toward the defendant, and me and my husband employed counsel to prosecute this case. I was down at John Kolls' house on the night of the shooting, but I did not tell John Kolls and Mrs. Brown and Mrs. Johnson and Fritz Kolls that Frank shot the first shot."

C. B. Adams testified that he returned home from town after the shooting on Oct. 28, and Frank Bauman was at his house and Mrs. Drew Adams was there and the defendant came up and cursed Bauman and said, "I shot at you down at the creek and you shot back at me," and told Bauman he was going to kill him. "I do not like defendant."

Robt. Smith and Charley Smith testified for the defendant that a few days before the shooting Frank Bauman told them that he would like to shoot Ellington and would like to fight him, with his target and Ellington with his shotgun, etc.

John Kolls, Mrs. Johnson, Mrs. Brown and Fritz Kolls all testified that they saw Mrs. Drew Adams on the night after the shooting and she said that Frank Bauman had shot at Ellington first and that Ellington had then shot at him as he ran behind a tree.

The defendant testified that on the evening of the trouble he was riding around his fence repairing it and met Mrs. Adams near the creek; that he was having a conversation with her, when Frank Bauman spoke up and as "I turned my head he fired at me, and he then unbreached his gun and was reloading it when I shot at him. He ran behind a tree and I told him to come out, I would not hurt him. He came out and I could have shot him if I had wanted to, but got on my horse and rode off. I shot at him to keep him from shooting at me. He had made one shot and I thought he was reloading his gun to shoot again. I was on my own land. I rode up to Mrs. Adams' house and she told me that Bauman shot first. I told her to remember that. I then went over to J. M. Smith's and told him what had happened. I told him just as I have stated it here. Sometime later I started to go

down to Mr. Kolls to see him on some business, and intended going down through Mr. Adams' place as that was the nearest way, but when I came to his house, Adams told me not to come through there and I went back home. I did not have any conversation at that time with them about the trouble, nor say that I had shot at Bauman and he had shot back at me, and that I intended to kill him yet. I went down to J. W. Kolls' on the next morning and told him about the trouble just as I have testified to the same in this case.

*McMahon & Curtis,* for appellant.—Appellant contends that the court erred in not permitting him to prove by the witnesses, J. M. Smith and Jno. Kolls, that on the evening of the shooting and the next day, defendant made a statement to them about how the shooting occurred, and that he told them that Frank Bauman had waylaid him and shot at him and that he had only fired back at Bauman in self-defense. The State having introduced evidence that the defendant had made statements after the trouble on the same day that he fired the first shot and which statements conflicted with his testimony on the trial; and defendant having denied that he ever made such statements, he should have been permitted to show that he had soon after the difficulty told J. M. Smith and John Kolls how the same occurred, and to show that such statements coincided with, corroborated and supported his testimony on the trial and that they were contrary to the statements testified to by Geo. Adams and his wife, Drew Adams. Campbell v. State, 35 Texas Crim. Rep., 160; Goode v. State, 32 Texas Crim. Rep., 505; Eli Kimball v. State, 37 Texas Crim. Rep., 230; Ballow v. State, 58 S. W. Rep., 1023; Bailey v. State, 9 Texas Crim. App., 98; Williams v. State, 24 Texas Crim. App., 637; Dicker v. State, 32 S. W. Rep., 541; Keith v. State, 44 S. W. Rep., 849; Jones v. State, 38 Texas Crim. Rep., 87.

The conversations and statements which the defendant offered to prove were clearly a part of the res gestæ, the immediate cause of the shooting and leading up to it, occurring just before and at the very time of the shooting. Declarations which are the immediate accompaniment of an act are admissible as part of the res gestæ. 8 Whart. Crim. Ev., sec. 31; McMahon v. State, 16 Texas Crim. App., 357; Russell v. State, 11 Texas Crim. App., 288; Gerick v. State, 45 S. W. Rep., 717; Cook v. State, 22 Texas Crim. App., 511; Wadlington v. State, 19 Texas Crim. App., 266; Farrar v. State, 29 Texas Crim. App., 250.

The State having introduced a part of the conversation between appellant and Mrs. Adams, he was entitled to have the whole of the same before the jury. Davis v. State, 3 Texas Crim. App., 91; Satterwhite v. State, 6 Texas Crim. App., 609; Pharr v. State, 9 Texas Crim. App., 129; Sager v. State, 11 Texas Crim. App., 110; Stockman v. State, 24 Texas Crim. App., 387; Spearman v. State, 34 Texas

Crim. Rep., 279; Lancaster v. State, 36 Texas Crim. Rep., 16; Pace v. State, 20 S. W. Rep., 762.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of an aggravated assault, and his punishment assessed at a fine of $300, and appeals. The facts of this case for the State briefly stated show, that prosecutor Frank Bauman and appellant Frank Ellington were neighbors, both engaged in farming—their farms situated on Nolan's Creek in Bell County. Prosecutor on the day in question was hunting and passed up the creek through the farm of Adams, which adjoined appellant's farm. There he witnessed a wordy altercation between Mrs. Adams and appellant, in which he interfered, and told appellant substantially that he knew that if Mr. Adams was at home he would not talk that way to Mrs. Adams. Appellant then turned his attention to him. Prosecutor started towards him, and as he was coming, appellant drew his hammer first and then his six-shooter. Prosecutor then run to a tree, and when he got about two steps from the tree, appellant shot at him first, and then he shot at appellant.

Appellant reserved two bills of exceptions to the introduction of evidence offered by him. The first bill shows that while defendant was on the stand and testified in his own behalf, counsel for defendant asked him to state the conversation had between him and Mrs. Adams and Frank Bauman, just immediately before and at the time of the shooting, for the purpose of explaining just what was said between Mrs. Adams, defendant and Bauman, and for the purpose of showing that appellant had not provoked any trouble with Bauman, and had not cursed and abused Mrs. Adams for dogging his cows. The county attorney objected to this testimony; that is, the portion showing a conversation between Mrs. Adams and defendant, which did not relate or refer to Bauman; and the court sustained the objection to this portion of the conversation. Appellant insists that this part of the conversation should be admitted, as it was a part of the res gestæ of the difficulty. He says that if defendant had been permitted to testify in regard to what had been said between himself and Mrs. Adams at the time of the shooting he would have shown that the shooting was not provoked by anything said or done by him immediately before or at the time of the shooting, but on the contrary would have shown the relations between Mrs. Adams and Frank Bauman were of the very friendliest and intimate nature, and that Bauman shot at defendant without any provocation and without defendant knowing that he was present, because of the threatening words and conduct of Mrs. Adams towards defendant.

If appellant had stated that portion of the conversation which he desired to prove so that we might determine its relevancy and meaning, it would seem then we could consider the question presented in

the light of the facts. As it is, he merely states that he wanted to prove the balance of the conversation, and he says that this would have shown that the shot was not provoked by anything said or done by him immediately before or at the time of the shooting, etc. This is a mere conclusion of appellant, and not the statement of facts, he was not permitted to prove. Unquestionably if the State proved a part of the conversation appellant was entitled to the balance, referring to the same subject. So far as we are advised, there is no statement of what this conversation was about. If appellant had set it out in the bill it might appear to be very material. On the other hand, it might appear to be absolutely frivolous and of no import. In the absence of a statement as to what this conversation was, we are not able to say that its exclusion operated to the injury of appellant.

In the next bill, appellant shows the testimony of Frank Bauman the prosecutor and Mrs. Adams, as to how the difficulty began, and who fired the first shot. The bill shows farther that appellant denied that he fired the first shot, and as stated in his testimony, the first shot was fired by prosecutor. Then it is shown that G. B. Adams testified that on the same evening, a little while after the difficulty, he came home from Belton, and Frank Bauman, the prosecutor, was at his house, and defendant came up to the house, some thirty or forty minutes after the shooting, and then made the statement to Frank Bauman: "I shot at you down at the creek, and you shot back at me, and I am going to kill you. I knocked the bark off the tree next to your head. You are one Dutchman I am going to kill. You shot back at me." That this was repeated a number of times by appellant who continuously cursed, abused and threatened Bauman, and told him he was going to kill him. Afterwards, while defendant was on the stand on his own behalf, he testified that he was at Adams at the time stated; that he came by there on his way from Smith's, where he went immediately after the shooting, not knowing that Bauman would be there, but he met Adams, Frank Bauman and Mrs. Adams all there; that he did not use any such language or make any such statements there about how the difficulty occurred as testified to by Adams. After this appellant proposed to prove that shortly after the shooting, some fifteen or twenty minutes thereafter, he went to the house of J. M. Smith, and told Smith how the difficulty occurred; that prosecutor shot at him first; that he was having a conversation with Mrs. Adams and he heard Frank Bauman say something, and as he looked around towards him Frank Bauman was shooting at him, and was in the act of reloading his gun, when defendant shot at him, Bauman was getting ready to shoot again. That this was what he had told him. That the next morning he also told one John Kolls the same thing. He proposed to prove by Smith and Kolls what he had told them. He insisted on his right to do this, in order to corroborate his own testimony, and to rebut the testimony of George Adams and Mrs. Adams. This was objected to on the part of the State on the ground that the same was self-serving; and the

court sustained the objection. Appellant cites us to a number of authorities, among others, Campbell v. State, 35 Texas Crim. Rep., 160; Goode v. State, 32 Texas Crim. Rep., 505; Kimbell v. State, 32 Texas Crim. Rep., 230. All of these cases are authority for the proposition that where appellant is put on the witness stand, and the State has impeached such witness by showing that he made a different statement to that testified to by him upon the point in issue, that it is competent for appellant in rebuttal to show that he made a similar statement to that testified to by him about the time of the transaction, in order to corroborate the witness. We do not understand in this particular case that the testimony offered by the State was for the purpose of impeachment. That is, it was original testimony showing a statement or confession coming from appellant himself as to how the difficulty occurred. It was not only a confession of appellant, but it appears to have been in the course of a conversation or altercation between prosecutor, and appellant, subsequent to the alleged offense that these witnesses testified about. We do not believe the rule of impeachment extends to this character of case. If so, whenever the State proves a confession or statement of appellant as to how a difficulty occurred, as original evidence against him, appellant would be authorized to introduce any number of witnesses to whom at other times he made different statements. We do not believe the court erred in rejecting this testimony.

Appellant also objects to the verdict of the jury because the same is not clear. We have examined the verdict, and it seems to us that the objection is not well taken. The verdict reads as follows: "We the jury find the defendant guilty of an aggravated assault on the person of Frank Bauman, and assess his punishment to a fine of $300." The use of the preposition "to" instead of "at a fine" does not vitiate the verdict.

There being no errors in the record, the judgment is affirmed.

*Affirmed.*